IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WARREN G. TAYLOR and MELINDA TAYLOR, Husband and Wife, and as Natural and Legal Guardians of S.T., a Minor; and CHRISTINE TAYLOR, an Individual,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>PAUL AND JUDY SAMSON, Husband and Wife; and INTERMOUNTAIN GAS COMPANY, an Idaho Corporation,<br><br>　　　　Defendants.<br>_____ | Case No. CV-05-225-S-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it Defendant Intermountain Gas Company's Motion for Summary Judgment (Docket No. 38) and Defendants Paul and Jude Samson's Motion for Summary Judgment (Docket No. 40). The Court held oral argument on the motions on September 5, 2007 and took the matter under advisement. The Court will grant the motions for the reasons expressed below.

## BACKGROUND

On or about May 3, 2002, the Taylors entered into a rental agreement with

**Memorandum Decision and Order - Page 1**

the Samsons, whereby the Taylors leased the residence located at 537 River Road, Grace, Idaho from the Samsons. The Taylors took possession of the property on May 17, 2002, and lived there until August 17, 2003.

Shortly after moving into the home, the Taylors began experiencing gastro-intestinal problems. They had the water supply tested, which yielded positive results for coliform.

Following this incident, on July 26, 2002, the Taylors called Defendant Intermountain Gas Company ("IGC"), complaining of headaches. IGC provides gas to the home. IGC sent a service technician to the residence who tested for carbon monoxide (CO). The technician informed the Taylors that he did not find any measurable levels of CO. The Taylors called IGC five more times over the next twelve months, complaining of headaches and the smell of gas. IGC's service technicians tested for CO on each occasion, but found no traceable levels of CO. The Taylors also notified the Samsons about their perceived presence of elevated levels of CO in the home.

On June 3, 2003, at the request of a potential buyer of the property, a home inspector, Ernest Tate, inspected the residence. As part of his inspection, Tate reported that he detected between 32 and 37 ppm CO in the proximity of a boiler located in the basement utility room, when standing three to six feet from the

**Memorandum Decision and Order - Page 2**

boiler, twenty five minutes after it had been lit. Tate did not test the ambient air in the home, however. Tate told the Taylors, the Samsons and the potential buyer that the boiler should be replaced. Approximately two weeks following Tate's inspection, IGC tested the home for CO and once again found none.

On July 30, 2003, Brent Martinsen, the owner of Reid's Plumbing and Heating of Soda Springs, Idaho, inspected the residence. Martinsen reported that he found between 5 and 10 ppm CO within a few inches of the water heater draft diverter. He also reported finding 150 ppm CO when he measured the CO about four to five inches from the direct vent of the open oven door, upon startup. This leveled off to 35 ppm within a few minutes. Martinsen took a reading of the ambient air in the home, which yielded low results.

On July 31, 2003, the day after Martinsen's inspection, IGC again responded to a call from the Taylors. The IGC service technician took a reading inside the kitchen with his combustible gas indicator. Again, IGC did not detect any measurable levels of CO in the ambient air.

On August 1, 2003, the Taylors sought treatment at Caribou Memorial Hospital. Blood was drawn from the Taylors, and the lab reports indicated that all of the Taylors' carboxyhemoglobin saturations were within normal limits. On August 4, 2003, the Taylors again sought treatment at Caribou Memorial Hospital,

**Memorandum Decision and Order - Page 3**

where they again received blood tests.  Except for S.T., a Minor, their carboxyhemoglobin saturations were again normal.  S.T., a minor's saturation was 1.8%, which is .3% above normal.  The Taylors filed their ten-count Complaint against the Samsons and IGC on June 7, 2005.

## STANDARD OF REVIEW

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id.* at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings.  *Id.*  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is

**Memorandum Decision and Order - Page 4**

not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the issue on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco*

*Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)).  Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts."  *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Only admissible evidence may be considered in ruling on a motion for summary judgment.  *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir.2002); *see also* Fed.R.Civ.P. 56(e).  In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered.  *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003).  If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay.  *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

Statements in a brief, unsupported by the record, cannot be used to create an issue of fact.  *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).  The Circuit "has repeatedly held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary

**Memorandum Decision and Order - Page 6**

judgment." *Beyene v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1182 (9th Cir.1988). Authentication, required by Federal Rule of Evidence 901(a), is not satisfied simply by attaching a document to an affidavit. *Id.* The affidavit must contain testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document. *Id.*

## APPLICABLE LAW

This case is before the Court based on diversity jurisdiction, pursuant to 28 U.S.C. § 1332. "Federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). It is undisputed that the alleged torts forming the basis of this action occurred in Idaho, and therefore Idaho substantive law applies. *See Glanzman v. Uniroyal, Inc.*, 892 F.2d 58, 59 (9th Cir. 1989) (applying Idaho law).

## ANALYSIS

A.   **Fraud Claims Against the Samsons and IGC (Counts 1 & 7)**

Under Idaho law, to avoid summary judgment on their fraud claims, the Taylors must establish the existence of disputed material facts sufficient to establish each of the following elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5)

**Memorandum Decision and Order - Page 7**

the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on the truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.  See Thomas v. Med. Ctr. Physicians, et al., 61 P.3d 557, 564 (Idaho 2002).  Moreover, a fraud claim must be stated with particularity.  F.R.C.P. 9(b).

The Taylors' allege that the Samsons and IGC made representations and omissions that the residence was free from elevated CO levels.  (See Complaint ¶¶ 21-26, 47-52).  However, the Taylors have failed to plead their fraud claims with particularity in accordance with Federal Rule of Civil Procedure 9(b).  The Taylors' Complaint does not allege that the Samsons made any specific representation regarding the level of CO in the home.  Moreover, the Taylors' Complaint fails to allege that the Samsons or IGC knew they were making a false representation.  Therefore, the Taylors have failed to allege facts showing that the defendants knowingly made a false representation.  See Thomas, 61 P.3d at 564.  The Court also notes that in their briefs, the Taylors did not articulate any opposition to summary judgment on the fraud claims.  Accordingly, the Court will grant summary judgment in favor of the defendants on the fraud claims.

**B.     Negligence Claim Against IGC (Count 8)**

**Memorandum Decision and Order - Page 8**

The Taylors must prove each of the following elements in order to show common law negligence: "(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage." *Alegria v. Payonk*, 619 P.2d 135, 137 (Idaho 1980) (distinguished on other grounds).

### 1. ICG's Duty

Whether a duty exists is a question of law, and thus appropriate for summary judgment. *See Turpen v. Granieri*, 985 P.2d 669, 672 (Idaho 1999). The Taylors contend that IGC assumed a legal duty of care when IGC agreed to inspect the Taylors' residence for CO. This is essentially a duty based on the Good Samaritan doctrine, which has been recognized by Idaho courts. *See Rawson v. United Steelworkers of America*, 726 P.2d 742, 746 (Idaho 1986) (reversed on other grounds). The doctrine is set forth in Restatement (Second) of Torts, and provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:
>
> (A) his failure to exercise reasonable care increases the

**Memorandum Decision and Order - Page 9**

>   risk of such harm, or
>
>   (B) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts, § 323. Under this doctrine, IGC had a duty to exercise reasonable care once it undertook to inspect the Taylors' residence.

### 2. ICG's Breach of Duty

The Taylors allege that IGC breached its duty to exercise reasonable care by failing to detect, prevent and abate the release of dangerous levels of CO in the residence. A conclusory statement that there were increased levels of CO in the residence is insufficient to show a breach of IGC's duty. Instead, the Taylors must present evidence crating a genuine issue of material fact as to whether IGC failed to exercise reasonable care in performing its undertaking. See Restatement (Second) of Torts, § 323.

To meet its burden, there must be evidence that IGC did not conform to a certain standard of conduct. Thus, the Court would expect to see evidence that IGC did not follow industry standards for gas companies in responding to complaints about gas leaks. For example, the Court would expect to see evidence that IGC improperly or negligently conducted CO testing of the residence, that IGC employed improper or negligent methods for detecting CO in the residence, or that IGC used faulty or unreliable equipment to detect CO in the residence. The

**Memorandum Decision and Order - Page 10**

Taylors have failed to offer any such evidence.[1] In contrast, IGC submitted evidence that IGC checked the ambient air in the home for CO on six separate occasions, using combustible gas indicators that were calibrated monthly according to IGC policy. (Second Thomas Aff., Ex. F; Ex. G, pp. 20:22-21:13).

The existence of toxic levels of CO, even if true, without evidence that IGC did not act in conformance with a certain standard of conduct, simply is not enough to create a genuine issue of fact with respect to whether IGC breached its duty of care. Therefore, the Court finds that, even taking the facts in the light most favorable to the Taylors, IGC did not breach its duty of care. Accordingly, summary judgment in favor of IGC is warranted.

### 3. IGC's Causation

Even if there were evidence creating a genuine issue of material fact as to IGC's breach of duty, the Taylors have failed to present evidence creating a

---

[1] Although not altogether clear from the briefs, the Taylors seem to suggest that one could infer that IGC technicians improperly conducted CO testing of the residence because they did not find elevated levels of CO, while the two home inspectors, Tate and Martinsen, did find elevated levels. However, on the one hand, the evidence clearly shows that IGC technicians calibrated and properly used their equipment. (Second Thomas Aff., Ex. G, pp. 20:22-21:13). On the other hand, both Tate and Martinsen testified that they did not properly maintain or calibrate their equipment. (Second Thomas Aff, Ex. E, pp. 52:6-14; 53:21-22; Ex. F, pp. 66:1-9; 67:5-968:8-14). Additionally, Martinsen acknowledged that IGC's equipment was probably more accurate than his equipment. (Second Thomas Aff., Ex. E, p. 47:12-20). The Court is not required to adopt unreasonable inferences from circumstantial evidence. *See McLaughlin v. Liu, 849 F.2d 1205, 1208 (9th Cir. 1988)*. The direct testimony of the IGC technicians, and the only reasonable inference from the home inspectors' testimony, is that IGC properly conducted CO testing of the residence.

**Memorandum Decision and Order - Page 11**

genuine issue of material fact that the breach caused the Taylors' alleged injuries. To show causation, the Taylors must present evidence that IGC's breach caused elevated levels of CO in the Taylors' residence, and that the elevated levels of CO in the residence caused the Taylor's alleged physical injuries.

To meet their burden, the Taylors offered the testimony of David G. Penney, PhD, an expert in the toxicology of CO.  Dr. Penney considered the self-reported symptoms of the Taylors and the potentially large amounts of CO in the residence to determine that the changes in the Taylors' health status occurred "entirely because of CO poisoning and not due to any other modality."  (Second Thomas Aff., Ex. B, Penney Report at 15).  Dr. Penny found that "CO alone is capable of producing all of the health damage that has been identified to date." Id.  Notably, however, Dr. Penney does not tie IGC's actions to elevated levels of CO in the residence, and he does not tie the Taylors' alleged injuries to elevated levels of CO in the residence.

Additionally, although Dr. Penney recommended further testing by "qualified health professionals," the Taylors have not submitted any evidence that they underwent any such testing.  (Id. at 15-16).  On the contrary, the physicians who treated the Taylors did not find that the Taylors' symptoms were caused by CO poisoning.  The Taylors sought treatment at Caribou Memorial Hospital on

**Memorandum Decision and Order - Page 12**

August 1 and August 4, 2003.  On both visits, the Taylors' blood was drawn and tested, and doctors performed physical examinations on them.  Dr. Soucie, who treated the Taylors on August 1, testified that the Taylors were not exposed to unhealthy levels of CO.  (Johnson Aff., Ex. 6, pg. 48).  Dr. West, who treated the Taylors on August 4, testified that the carboxyhemoglobin tests given to the Taylors were done for the purpose of giving the physicians an idea of how many carbon monoxide molecules had attached to the hemoglobin.  He testified that a normal percentage is less than 1.5%.  Dr. West testified that all of the Taylors were within the normal range, except S.T., a minor, whose percentage was 1.8%, slightly above normal.  Still, Dr. West stated that S.T., a minor's results did not cause him concern.  (Second Thomas Aff, Ex. A, pp. 16-17).  Dr. West also testified that based on the physical exams of the Taylors, he did not see evidence of CO exposure.  (Second Thomas Aff, Ex. A, p. 32).

The lack of evidence creating a genuine issue of material fact as to causation is further reason to grant summary judgment in favor of IGC on the Taylors' negligence claim.

## C. Negligence Claim Against the Samsons (Count 5)

"A tenant can recover damages from his landlord based upon negligence." *Silver Creek Computers, Inc. V. Petra, Inc.*, 42 P.3d 672, 676 (Idaho 2002).

**Memorandum Decision and Order - Page 13**

Accordingly, the Court will address the same common law elements of negligence here as it did with the Taylors' negligence claim against IGC.  Again, the Taylor's must establish: "(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage." *Alegria v. Payonk*, 619 P.2d 135, 137 (Idaho 1980) (distinguished on other grounds).

### 1. Samsons' Duty

The Idaho Supreme Court has concluded that "a landlord is under a duty to exercise reasonable care in light of all the circumstances." *Stephens v. Stearns*, 678 P.2d 41, 50 (Idaho 1984).  However, the court "stress[ed] that adoption of this rule is not tantamount to making the landlord an insurer for all injury occurring on the premises, but merely constitutes our removal of the landlord's common-law cloak of immunity.  Those questions of hidden danger, public use, control, and duty to repair, which under the common-law were prerequisites to the consideration of the landlord's negligence, will now be relevant only inasmuch as they pertain to the elements of negligence, such as foreseeability and unreasonableness of the risk." *Id.*

### 2. Samsons' Breach of Duty

**Memorandum Decision and Order - Page 14**

As with their negligence claim against IGC, The Taylors allege that the Samsons breached their duty to exercise reasonable care by failing to detect, prevent and abate the release of dangerous levels of CO in the residence. In their brief, the Taylors suggest that there were elevated levels of CO in the residence and that they experienced symptoms related to CO poisoning. The Taylors then state that "[i]t is clear that had the Defendants fulfilled their duty of reasonable care to the Taylors, they would not now be suffering from the effects of being poisoned by chronic exposure to carbon monoxide." (Taylors' Response Brief, pp. 6-7).

Again, a conclusory statement that there were increased levels of CO in the residence, and that the Taylors' suffered CO poisoning, is insufficient to show a breach of duty. The Taylors have presented no evidence that the Samsons did not conform to a certain standard of conduct. There is no evidence that a reasonable landlord in the shoes of the Samsons would have done anything different given IGC's negative CO test results. Without more, there simply is no evidence creating a genuine issue of material fact with respect to whether the Samsons breached their duty of care. Therefore, the Court finds that, even taking the facts in the light most favorable to the Taylors, the Samsons did not breach their duty of care. Accordingly, summary judgment in favor of the Samsons is warranted.

3.   **Samsons' Causation**

**Memorandum Decision and Order - Page 15**

Even if the Court were to find a genuine issue of material fact as to the Samsons' breach of duty, for the same reasons discussed above with respect to IGC's causation of the Taylors' alleged damages, the Taylors have failed to present evidence creating a genuine issue of material fact that the Samsons caused the Taylors' alleged injuries. The Taylors fail to advance any evidence showing that the Samsons' breach caused elevated levels of CO in the Taylors' residence, and that the elevated levels of CO in the residence caused the Taylors' alleged physical injuries. Accordingly, the lack of evidence creating a genuine issue of material fact as to causation is further reason to grant summary judgment in favor of the Samsons on the Taylors' negligence claim.

### C. Negligent Infliction of Emotional Distress: Defendants Samson and Intermountain Gas Company (Counts 6 & 9)

Negligent Infliction of Emotional Distress must be based on the breach of a recognized legal duty. *See Nation v. State Dept. Of Corr.*, 158 P.3d 953, 967 (Idaho 2007). As discussed above, nether IGC nor the Samsons breached a recognized legal duty. Accordingly, the Court will grant summary judgment in favor of defendants on the Taylors' negligent infliction of emotional distress claims.

### D. Breach of Warranties and Breach of Contract Against Samsons (Count 4)

**Memorandum Decision and Order - Page 16**

Initially, the Taylors argued that the Samsons owed them a statutory duty of care pursuant to Idaho Code § 6-320(3). (Plaintiffs' Memorandum in Opposition to Motions for Summary Judgment, p. 3). The Taylors also referenced I.C. § 6-320(3) as the basis for their breach of contract claim. However, after the Court asked the parties to brief whether notice is required for binging a claim pursuant to I.C. § 6-320(3), the Taylors stated in their supplemental brief that they "seek recovery under a theory of negligence, and not under the statutory warranty of habitability, [and therefore] the notice requirements of Idaho Code § 6-320 are not applicable." (Plaintiff's Supplemental Brief, p. 2). Therefore, the Court will grant summary judgment in favor of the Samsons on the Taylors' breach of warranties and breach of contract claims.

However, even if the Taylors had not effectively withdrawn their claims pursuant to I.C. § 6-320(3), the Court would have granted summary judgment in favor of the defendants. The statute requires that a tenant "give his landlord three (3) days written notice, listing each failure or breach upon which his action will be premised and a written demand requiring performance or cure. If, within three (3) days after service of notice, any listed failure or breach has not been performed or cured by the landlord, the tenant may proceed to commence an action for damages and specific performance." Idaho Code § 6-320(d).

**Memorandum Decision and Order - Page 17**

The Taylors contend that they provided written notice to the Samsons by letter dated October 11, 2003. That letter, however, was sent to Farm Bureau, not the Samsons. The statute specifically states that a tenant must give his *landlord* three days written notice. Farm Bureau was not the Taylors' landlord; the Samsons were the Taylors' landlord. Moreover, the letter does not request performance or cure of listed failures; it requests $564,139.56 in "special damages." The letter does not fulfill the I.C. § 6-320(d) requirements.

### E.   Breach of the Implied Covenant of Good Faith and Fair Dealing Against Samsons (Count 3)

The Taylors allege that the breach of contract in Count 2 was motivated by bad faith and is therefore a breach of the covenant of good faith and fair dealing. Given the Court's determination that there was no breach of contact, the Court will grant summary judgment in favor of the Samsons on the breach of the covenant of good faith and fair dealing claim as well.

### ORDER

NOW THEREFORE IT IS HEREBY ORDERED that the Motion for Summary Judgment by Defendant Intermountain Gas Company (Docket No. 38) shall be, and the same is hereby, GRANTED.

IT IS FURTHER ORDERED that Defendants Paul and Jude Samson's Motion for Summary Judgment (Docket No. 40) shall be, and the same is hereby,

**Memorandum Decision and Order - Page 18**

GRANTED.

IT IS FURTHER ORDERED that the following motions to exclude testimony (Docket Nos. 41, 42, 43, 44 and 45), and the following motions to strike (Docket Nos. 63, 65 and 71) shall be, and the same are hereby, DEEMED MOOT.

The Court will enter a separate Judgment as required by Federal Rule of Civil Procedure 58.



DATED:  **September 24, 2007**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order - Page 19**